**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph C. Rocko, Jr., | No. CV-11-830-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Michael Astrue, Commissioner of Social Security Administration, | |
| Defendant. | |

Pending before the Court is the appeal of Plaintiff, Joseph C. Rocko, Jr., which challenges the Social Security Administration's decision to deny benefits. (Doc. 1). For the reasons set forth below, the Court affirms the decision in part, vacates the decision in part, and remands for further proceedings.

## BACKGROUND

The evidence contained in the administrative record includes the following. Plaintiff who was born in November, 1965, alleges that he has been disabled since December 22, 2006. (R. at 124). Prior to the alleged onset of his disability, Rocko had relevant work experience as a kitchen manager and cook. (R. at 135).

From May 2003 until June 2009, Plaintiff sought treatment from Dr. Bill Evans

with Spectrum Health Center.  (R. at 309–10, 314–17, 320–23, 363–87).  Dr. Evans expressed concern for Plaintiff's cardiac health and noted that he suffered from fatigue, anxiety, insomnia, HLA-B27, and chronic pain.  (R. at 309, 348).

In late 2006, Plaintiff stopped working because of fatigue and shortness of breath. (R. at 134, 157).  He also complained of palpitations, feeling his heart racing, and having occasional numbness and tingling in his left arm.  (R. at 209).  Plaintiff underwent an echocardiogram that showed global left ventricular dysfunction and an ejection fraction of approximately thirty-five percent.  (R. at 183).

In January 2007, Plaintiff began treatment with Dr. Mitchell Ross, of the Arizona Cardiology Group.  Dr. M. Ross recommended he submit to a sleep study to diagnose his sleep disorders and have an electrical cardioversion performed.  (R. at 201).  After several attempted cardioversions failed to restore sinus rhythm, Plaintiff declined admission into St. Joseph's Hospital because of a poker tournament commitment.  (R. at 198).  On January 30, 2007, Plaintiff followed up with Dr. Thomas Ross, also of the Arizona Cardiology Group, who became his treating cardiologist from this point on.  (R. at 196).  He was diagnosed with continuous atrial fibrillation with rapid ventricular rates refractory to medical management, hypertension, possible sleep apnea, and a dilated aortic root. (R. at 197).   The next day, Plaintiff underwent another electrical cardioversion which also proved unsuccessful.  (R. at 282).  Plaintiff again declined recommended inpatient treatment due to a poker tournament.  (R. at 283).

In February 2007, Plaintiff was hospitalized at St. Joseph's Hospital, under the

treatment of Dr. Youngsoo Cho, due to rapid heart rates and shortness of breath.  He came into the emergency room with a heart rate of 270 beats per minute.  (R. at 250).  He had a resting rate of 80–100, but simply speaking with Dr. Cho would cause his heart rate to increase to 130–140.  *Id.*  His ejection fraction had dropped to fifteen percent the week before hospitalization.  *Id.*

On February 8, 2007, Plaintiff protectively filed his application for disability insurance benefits and supplemental security income, alleging a disability onset date of December 22, 2006.  (R. at 104).  Plaintiff's date last insured ("DLI") for disability insurance benefits, and thus the date on or before which he must have been disabled, was December 31, 2010.  (R. at 16).

On February 13, 2007, Plaintiff underwent an AV node ablation and surgical implantation of a permanent transvenous biventricular pacemaker-defibrillator, lead system, and generator.  (R. at 256).  The next day, Plaintiff was discharged in stable condition with plans to investigate his sleep disorders as an outpatient.  (R. at 233).

On March 9, 2007, Plaintiff returned to Dr. T. Ross for follow up.  His condition was improving, but he still struggled with exertional dyspnea.  (R. 331).  Dr. T. Ross discussed how the improvement process can take a number of months.  Id.  Between March and June 2007, Plaintiff lost his insurance and his home, was noncompliant in following up, and did not keep several appointments he made.  (R. at 325).

On June 13, 2007, Plaintiff returned to Dr. M. Ross.  He was diagnosed with status post AV node ablation for refractory atrial fibrillation with rapid ventricular rates

(complete heart block), congestive heart failure (functional class II), dilated cardiomyopathy, hypertension, and possible sleep apnea. (R. at 325–26). Prior to his surgery, he had severe class III or class IV heart failure. (R. at 330). Plaintiff's ventricular function improved (his ejection fraction was up to thirty-eight percent), but there was "still the unanswered issue of his sleep apnea." (R. at 326, 333).

On August 15, 2007, Plaintiff returned to Dr. Evans of Spectrum Health Center for treatment for his degenerative disc disease, essential hypertension, and insomnia. (R. at 376–87). He complained of continued dyspnea on exertion, pain in his back and right leg, and trouble sleeping. (R. at 376). Dr. Evans stated Plaintiff was "completely disabled" and prescribed ongoing treatment plans for these complaints. (R. at 384–86).

On November 5, 2007, Dr. T. Ross treated Plaintiff again, and noted Plaintiff's perpetual noncompliance in follow up. (R. at 334). His ventricular functions were stabilized with his pacemaker defibrillator showing excellent pacing thresholds. (R. at 335). Dr. T. Ross cleared him for hernia repair surgery, and mentioned, "[h]e still probably has sleep apnea, but he still has not gotten around to having the sleep study performed despite several referrals." Id. Plaintiff was encouraged again to undergo a sleep study. *Id.*

In December 2007, Dr. Erika Wavak, a state agency physician, completed a "Physical Residual Functional Capacity Assessment" wherein she concluded Plaintiff could perform light work that did not require climbing of ladders, ropes, or scaffolds or more than occasional climbing of ramps or stairs and crawling. (R. at 338–42). After

- 4 -

reviewing Plaintiff's medical records, she also noted that the alleged severity of his symptoms was not supported by the medical evidence.  (R. at 343).

A month later, Dr. Evans submitted a statement on Plaintiff's behalf.  He wrote, "[Plaintiff] has multiple medical problems which have not allowed him to maintain gainful employment."  (R. at 348).  Dr. Evans then enumerated Plaintiff's conditions as follows: severe back pain related to a positive HLA-B27 arthropathy, anxiety disorder, and cardiomyopathy.  *Id.*

On June 12, 2009, Dr. Evans completed a "Medical Assessment of Ability to do Work-Related Physical Activities."  (R. at 402).  He assessed Plaintiff could not work an eight-hour day.  He wrote that Plaintiff could only lift less than ten pounds, sit for two hours, and stand or walk for less than two hours each.  (R. at 402–03).   He also commented that Plaintiff had moderately severe medication side effects and pain, depression, and anxiety that severely limit his ability to sustain work activity for eight hours a day.  (R. at 403).

On June 22, 2009, Administrative Law Judge, Joan G. Knight, conducted a hearing to review the Social Security Administration's denial of Plaintiff's application for benefits.  Plaintiff testified to his impairment as follows.  He complained of hip and knee pain which required a prescribed cane for mobility.  (R. at 31–32).  He stated he could only stand for ten to fifteen minutes, sit for ten to fifteen minutes, and walk for five to ten minutes.  (R. at 33–34).  Plaintiff said he could only sleep four hours a night, due to dyspnea, and therefore needed to take three or four naps a day.  (R. at 33).  Furthermore,

Plaintiff testified that he had difficulty performing everyday tasks.  For instance, he stays at home most days, has his sister help with household chores, and becomes breathless when performing menial tasks, such as taking a shower.  (R. at 33, 38).

Dr. George Bluth, a vocational expert, also testified at the hearing.  He testified that a person of Plaintiff's limitations would not be able to perform the past relevant work, but that there is unskilled work available (including cashier, assembly worker, and quality control inspector).  (R. at 44).  However, he also testified that, if the Plaintiff needed a cane or needed to nap, there would be no work available for him.  (R. at 45).  Dr. Bluth's testimony was based on the number of light unskilled positions available that offer "sit, stand" options.  These numbers were not consistent with the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT"), but were extrapolated from his expertise, familiarity with the workplace, and observations of how these jobs are performed in the workplace.  (R. at 48–49).  He stated there was nothing else in his testimony that was not consistent with the DOT.  (R. at 49).

## ANALYSIS

Plaintiff's claim was denied both initially and upon reconsideration.  (R. at 55, 65).  Plaintiff then appealed to an Administrative Law Judge ("ALJ").  (R. at 68).  The ALJ conducted a hearing on the matter on June 22, 2009.  (R. at 25–51).

In evaluating whether Plaintiff was disabled, the ALJ undertook the five-step

sequential evaluation for determining disability.[1]   (R. at 14–22).  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. at 16).  At step two, the ALJ determined that Plaintiff suffered from the severe impairments of lumbar degenerative disc disease/osteophytic spurring, cardiomyopathy with defibrillator implant, status post hernia repair and obesity.  *Id.*  At step three, the ALJ determined that none of these impairments, either alone or in combination, met or equaled any of the Social Security Administration's listed impairments.  *Id.*

At that point, the ALJ made a determination of Plaintiff's residual functional capacity ("RFC"),[2] concluding that Plaintiff could perform sedentary work as defined in

---

[1]  The five-step sequential evaluation of disability is set out in 20 C.F.R. § 404.1520 (governing disability insurance benefits) and 20 C.F.R. § 416.920 (governing supplemental security income).  Under the test:

> A claimant must be found disabled if he proves: (1) that he is not presently engaged in a substantial gainful activity[,] (2) that his disability is severe, and (3) that his impairment meets or equals one of the specific impairments described in the regulations.  If the impairment does not meet or equal one of the specific impairments described in the regulations, the claimant can still establish a prima facie case of disability by proving at step four that in addition to the first two requirements, he is not able to perform any work that he has done in the past.  Once the claimant establishes a prima facie case, the burden of proof shifts to the agency at step five to demonstrate that the claimant can perform a significant number of other jobs in the national economy.  This step-five determination is made on the basis of four factors: the claimant's residual functional capacity, age, work experience and education.

*Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007) (internal citations and quotations omitted).

[2]  RFC is the most a claimant can do despite the limitations caused by his impairments.  *See* S.S.R. 96–8p (July 2, 1996).

20 CFR § 404.1567(a).  *Id.*  The ALJ thus determined at step four that Plaintiff did not retain the RFC to perform his past relevant work as a kitchen manager and cook.  (R. at 21).  The ALJ also reached step five, determining that Plaintiff could perform a significant number of other jobs in the national economy that met his RFC limitations. *Id.*  Given this analysis, the ALJ concluded that Plaintiff was not disabled.  (R. at 22).  On February 24, 2011, the Appeals Council declined to review the decision, leaving the ALJ's decision as the Commissioner of Social Security's final decision.  (R. at 1–5).

On April 25, 2011, Plaintiff filed suit in this Court.[3]  (Doc. 1)  The matter is now fully briefed before this Court.  (Doc. 13; Doc. 16; Doc. 20)

## I.    Standard of Review

A reviewing federal court will only address the issues raised by the claimant in the appeal from the ALJ's decision.  *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  A federal court may set aside a denial of disability benefits only if that denial is either unsupported by substantial evidence or based on legal error.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  Substantial evidence is "more than a scintilla but less than a preponderance."  *Id.* (quotation omitted).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  *Id.* (quotation omitted)

However, the ALJ is responsible for resolving conflicts in testimony, determining

---

[3] Plaintiff was authorized to file this action by 42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . .").

credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted).

## II.    Analysis

Plaintiff argues that the ALJ erred by: (A) improperly weighing medical source opinion (Doc. 13 at 9–15); (B) failing to consider Plaintiff's impairments in combination (*id.* at 22–24); (C) rejecting Plaintiff's subjective complaint testimony without articulating clear and convincing reasons for doing so (*id.* at 15–22); and (D) using vocational expert testimony that did not meet Plaintiff's residual functional capacity limitations (*id.* at 24). Plaintiff's first three arguments allege error in the ALJ's calculation of his residual functional capacity. Plaintiff's final argument relates to the ALJ's application of the RFC in her step-five analysis. The Court will address each argument in turn.

A residual functional capacity ("RFC") is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96–8p. In particular, the RFC assessment must describe the maximum amount of each work-related activity the individual can perform based on the

evidence available in the case record.  *Id.*  The RFC determination may be based on a wide variety of evidence in the record–the claimant's medical history, laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributable to a medically determinable impairment, evidence from attempts to work, the need for a structured living environment, and work evaluations.  *Id.*

### A.    Treating Source Opinion

Plaintiff contends that the ALJ improperly rejected the opinion of his treating physician, Dr. Evans, when assessing his RFC.  Despite the Plaintiff's contention that the ALJ only rejected Dr. Evans's opinion because it contradicted a non-examining physician's finding, the ALJ in fact provided several reasons for rejecting Dr. Evans's opinions and alternatively relying on the findings of other treating and non-examining physicians.

When evidence in the record contradicts the opinion of a treating physician, the ALJ must present "specific and legitimate reasons" for discounting the treating physician's opinion, supported by substantial evidence.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  When presented with conflicting medical opinions, the ALJ must determine credibility and resolve the conflict.  *Batson*, 359 F.3d at 1195.  Greater weight must be given to the opinion of treating physicians, and where there is a conflict "the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician."  *Id.*

In this case, the ALJ gave specific and legitimate reasons to discount the opinion of Dr. Evans regarding the degree of Plaintiff's impairment.  First, Dr. Evans' opinions were not consistent with his own treatment notes.  (R. at 17).  The same day Dr. Evans concluded Mr. Rocko was "completely disabled," his treatment notes show Plaintiff as only moderately obese, with normal strength, heart rate, range of motion and sensation in the musculoskeletal findings.  (R. at 376—84).  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2007) (reasoning that an inconsistency between a doctor's questionnaire and medical records is a sufficient reason for rejecting the doctor's opinion).

Second, because the ALJ had legitimately discredited the conclusory opinions found in Dr. Evans's August 2007 treatment notes, she justifiably chose to reject his RFC assessment.  An ALJ may discredit treating physicians' opinions that are unsupported by the record as a whole.  *Batson*, 359 F.3d at 1195.  The opinions of treating, examining and non-examining physicians all serve as substantial evidence in the record.  *See Thomas*, 278 F.3d at 957.  Plaintiff's cardiologist, Dr. T. Ross, treated him as frequently as "consistent with accepted medical practice for the type of treatment [] required for [Plaintiff's] medical condition."  20 CFR § 404.1502.  Dr. T. Ross is therefore a treating physician whose conclusions contradicted those of Dr. Evans.  Specifically, in March 2007, Dr. T. Ross noted Plaintiff was functional class II, his ventricular function was continuing to improve, and he was not displaying signs of edema.  (R. at 192).  Again, in June and November 2007, Dr. T. Ross noted signs of improvement in Plaintiff's conditions.  (R. at 333–35).  The ALJ relied on both Dr. T. Ross's treatment notes and

Dr. Wavak's RFC assessment when rejecting the opinions stated in Dr. Evans's assessment. (R. at 20). The ALJ justifiably concluded Dr. Evans's conclusions were not supported by the record as a whole.

Although a treating physician's opinion is generally afforded the greatest weight, it is not binding on an ALJ with respect to the ultimate determination of disability. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011). The ALJ did not err in rejecting Dr. Evans's opinion. The ALJ's weighing of medical source opinion was rational, and "[w]hen the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson*, 359 F.3d at 1198.

## B.    Obesity

Plaintiff also avers that the ALJ failed to consider his maladies in combination by ignoring the incremental effect his obesity has on his symptoms. *See* SSR 02–1p. This argument is without merit.

In deciding an application for social security disability benefits, the ALJ must consider the impact of claimant's obesity on his impairments and RFC where claimant presented evidence that reasonably alerted the ALJ to the fact that obesity was exacerbating his other symptoms. *See Edwards-Alexander v. Astrue*, 336 F. Appx. 634, 637 (9th Cir. 2009). "The fact that obesity is a risk factor for other impairments does not mean that individuals with obesity necessarily have any of these impairments." SSR 02–01p.

Plaintiff argues the ALJ "appears to discuss each impairment in isolation." (Pl.'s

Br. at 23).  However, the ALJ specifically considered Plaintiff's obesity in determining that he was capable only of performing sedentary work (R. at 21), listed his obesity in step three of her analysis (R. at 16), and referenced all of the physicians' medical records noting Plaintiff's obesity (R. at 17–20).  *See Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (suggesting an ALJ sufficiently considers claimant's obesity by arriving at a final decision predicated on the medical opinions of physicians familiar with the claimant's obesity).

Plaintiff also avers the ALJ failed to specifically analyze the impact of his obesity on his ability to work.  To the contrary, the ALJ provided a reasonably thorough review and discussion of Plaintiff's medical history.  She observed Plaintiff had experienced heart, back, knee, and shortness-of-breath problems in the past, his edema was no longer present and he was now functional class II.  (R. at 17–20).  She concluded this permitted him to perform sedentary work that did not involve heavy lifting.  (R. at 20).

Further, neither the medical reports nor Plaintiff's contentions suggest his obesity aggravated his other impairments before the December 2006 onset date of his disability. The Plaintiff's weight was not the reason he stopped working at the alleged disability onset date (R. at 31, 40), he had worked at this weight for years prior (R. at 317), and the ALJ noted his significant weight loss after this date.  (R. at 20).  The ALJ's assessment of Plaintiff's obesity is rational and supported by substantial evidence.

C.     **Subjective Complaint Testimony**

Plaintiff argues that the ALJ failed to give proper credit to his subjective complaint testimony.  However, the ALJ provided several clear and convincing reasons for partially rejecting his testimony.

When determining the severity of symptoms from alleged impairments, the ALJ must determine whether the impairment or combination of impairments "could reasonably be expected to produce pain or other symptoms."  *Batson*, 359 F.3d at 1196 (quotation omitted).  If the ALJ determines that the claimant's alleged impairments reasonably could be expected to produce the alleged symptoms, and if the "claimant's testimony shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms only with 'specific findings stating clear and convincing reasons for doing so.'"  *Id.* (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)).  The ALJ may consider "at least" the following factors when weighing the claimant's credibility:

> claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between his testimony and his conduct, claimant's daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains.

*Thomas*, 278 F.3d at 958–59.  In weighing these factors, an "ALJ cannot be required to believe every allegation of disabling pain, [because] many medical conditions produce pain not severe enough to preclude gainful employment."  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  At the same time, "[o]nce the claimant produces objective medical

- 14 -

evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate" the claimant's allegations. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009) (citing *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

The ALJ found that Plaintiff suffered from the severe impairments of lumbar degenerative disc disease/osteophytic spurring, cardiomyopathy with defibrillator implant, status post hernia repair, and obesity.  (R. at 16).  She also found these impairments could reasonably be expected to cause the alleged symptoms, yet discredited some of Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms. (R. at 20).  Plaintiff testified to hip and knee pain which required a prescribed cane for mobility.  (R. at 31–32).  He stated he could only stand for ten to fifteen minutes, sit for ten to fifteen minutes, and walk for five to ten minutes.  (R. at 33–34).  Plaintiff said he could only sleep four hours a night, due to dyspnea, and therefore needed to take three or four naps a day.  (R. at 33).  Furthermore, Plaintiff testified that he had difficulty performing everyday tasks.  For instance, he stays at home most days, has his sister help with household chores, and becomes breathless when performing menial tasks, such as taking a shower.  (R. at 33, 38).

Because the ALJ concluded that Plaintiff's impairments reasonably could cause the alleged symptoms and because she made no finding of malingering, the Court may affirm her decision rejecting the subjective complaint testimony only if she stated clear

and convincing reasons for rejecting Plaintiff's testimony. *See Tommasetti v. Astrue*, 533 F.3d at 1039. Contrary to Plaintiff's assertion, the ALJ did not rely solely on the lack of corroborating medical evidence and history of substance abuse, but offered several clear and convincing reasons for partially rejecting his testimony with respect to the severity of his cardiomyopathy and other impairments.

With respect to Plaintiff's cardiomyopathy, the ALJ explained there was marked improvement after ongoing treatment and surgical implantation of a biventricular pacemaker defibrillator. (R. at 18–20). For instance, in March 2007, Plaintiff reported to Dr. T. Ross that he had no problems sleeping at night with dyspnea, no edema, and only had incisional discomfort. (R. at 191). Also, prior to the surgery, Plaintiff had class III or class IV heart failure with continuous atrial fibrillation and flutter with rapid ventricular rates. *Id.* In June 2007, he was functional class II. (R. at 325). An echocardiogram performed the same month showed "marked improvement in ventricular function" with an ejection fraction of thirty-eight percent. (R. at 333). Alternatively, in August 2007, Dr. Evans concluded Plaintiff's cardiomyopathy left him "completely disabled." (R. at 384). Nevertheless, it is within the ALJ's province, not the Court's, to weigh medical testimony. *See Andrews*, 53 F.3d at 1039 (deferring to the ALJ's weighing of medical evidence). Further, despite the medical records, Plaintiff testified to the ineffectiveness of the pacemaker and defibrillator. (R, at 20, 39–40). Plaintiff's marked improvement, along with conflicting testimony claiming the pacemaker did not help, provided the ALJ with a clear and convincing reason for partially discrediting his

testimony.

Furthermore, The ALJ discredited Plaintiff's testimony of lower extremity edema (swelling) because this symptom was "not documented as alleged." (R. at 21). The medical records show "some" lower extremity edema prior to the implantation of his pacemaker, in February 2007, but no edema documented thereafter in March or November 2007. (R. at 251, 330, 335). Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor the ALJ can consider in her credibility analysis. *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

The ALJ also made note of Plaintiff's noncompliance with prescribed follow-up procedures. In Dr. T. Ross's final examination, he noted Plaintiff continued to be noncompliant with follow-up procedures, remained a functional class II with significant improvement in ventricular function, and had never followed up for his sleep study. (R. at 334–35). Although Plaintiff avers that his noncompliance in follow up was the result of losing his health care insurance, the record does not support this argument. (Doc. 13 at 18). Dr. T. Ross's June 2007 report noted Plaintiff had made several appointments which he did not keep. (R. at 325). In November 2007, Dr. T. Ross noted Plaintiff's continued noncompliance in follow up despite having assistance through Arizona Health Care Cost Containment System ("AHCCCS"). (R. at 334). The ALJ may consider many factors in weighing a claimant's credibility, including "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Tommasetti*, 533 F.3d at 1039. Further, Plaintiff never sought treatment for his sleep apnea and failed to

- 17 -

submit to a sleep study despite several referrals by his cardiologist.  (R. at 18, 20, 334–35).  The ALJ is permitted to consider a claimant's failure to pursue treatment in her credibility determination.  *See Burch*, 400 F.3d at 681.  The ALJ thus did not err in partially rejecting Plaintiff's subjective complaint testimony because the record contains documented medical improvement, undocumented edema as alleged, and an inadequately explained failure to comply with follow up procedures and seek treatment for his sleep apnea.  Based on the clear and convincing reasons for a partially adverse credibility finding and the substantial evidence to support her determination, the Court affirms the ALJ's evaluation of Plaintiff's testimony.

### D.    Vocational Expert Testimony

Plaintiff asserts that reliance on the vocational expert's ("VE's") testimony, which conflicted with the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT"), was improper because the ALJ did not adequately resolve the conflict between the VE's findings and the information in the DOT.  See SSR 00-4p.  Plaintiff also avers the ALJ erred by failing to obtain vocational expert testimony that comports with his RFC.  The Court finds merit in both allegations; however, only the latter constitutes harmful legal error.

The ALJ erred by claiming the VE's testimony is consistent with the information contained in the DOT, when in fact his testimony was in conflict with the DOT.  (R. at 22). This constitutes harmless error, because the VE testified to this conflict in the hearing.  (R. at 48–49).  The ALJ properly inquired as to whether an inconsistency

existed.  (R. at 48).  Dr. Bluth admitted his conclusions were not based on the DOT, but were arrived at through direct observations of the relevant jobs as performed in the local economy.  *Id.*  "Neither the DOT nor the VE evidence automatically 'trumps' when there is a conflict."  SSR 00–4p; *see also McCartey v. Massanari*, 298 F.3d 1072, 1075 (9th Cir. 2002) (noting an ALJ may properly rely on a VE's testimony).  Thus the ALJ's failure to adequately explain the basis for her reliance on the VE's testimony in her decision was harmless.

Nonetheless, the ALJ also erred when she posed a hypothetical to the VE that did not meet the Plaintiff's RFC.  (R. at 44–45).  The ALJ asked Dr. Bluth to assume a hypothetical individual of Plaintiff's age, education, and work experience with the following limitations: he "could frequently lift and carry 10 pounds, occasionally 20 pounds, stand and or walk with normal breaks about *four* out of eight hours, sit with normal breaks about four out of eight hours, no limits in pushing or pulling..." (R. at 44) (emphasis added).  The ALJ's subsequent set of questions involved a hypothetical individual who is limited to lifting only ten pounds, but with all other limitations, including the time during which he can stand and or walk, remained unadjusted.  (R. at 45).  These hypotheticals were posed without regard to Plaintiff's RFC that limits his ability to "stand and/or walk [to] *two* hours in an 8-hour period and sit 6 hours."  (R. at 16) (emphasis added).  Dr. Bluth did not consider a hypothetical individual with a maximum capacity to stand and or walk for only two hours in an eight-hour work day. (R. at 44–45, 47).  The VE's testimony did not establish that a significant number of jobs

- 19 -

exist that meet his RFC limitations. Therefore, the government did not meet its burden of proof in establishing the Plaintiff is not disabled. *See Hoopai*, 499 F.3d at 1074–75. Accordingly, the Court finds the ALJ erred in assessing Plaintiff's ability to perform a significant number of jobs in the national economy. Her step-five finding is not supported by substantial evidence.

## III.    Remedy

Having decided to vacate the ALJ's decision, the Court has the discretion to remand the case either for further proceedings or for an award of benefits. *See Reddick*, 157 F.3d at 728. The rule in this Circuit is that the Court should:

> credit[] evidence and remand[] for an award of benefits where (1) the ALJ has failed to provide legally sufficient reasons for rejecting [certain] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen*, 80 F.3d at 1292. Here, the ALJ has provided legally sufficient reasons for rejecting certain testimony and evidence, but failed to adequately support her step-five finding. The record does not resolve the issue whether Plaintiff is able to perform a significant number of jobs with the limitation of standing and or walking for only two hours in an eight-hour work day.

Thus, it is not "clear from the record that the ALJ would be required to find the claimant disabled," and there remain "outstanding issues that must be resolved before a determination of disability can be made." *Smolen*, 80 F.3d at 1292. Under these

circumstances, the Court will remand for further proceedings.

## CONCLUSION

The ALJ erred by failing to accurately use Plaintiff's residual functional capacity to determine whether he can perform a significant number of jobs in the national economy. Therefore, the Court finds there is not substantial evidence to support the ALJ's denial of benefits.

**IT IS THEREFORE ORDERED** that the ALJ's decision is **AFFIRMED IN PART AND VACATED IN PART**.

**IT IS FURTHER ORDERED** that this case is **REMANDED** for further proceedings.

Dated this 22nd day of June, 2012.

*H. Murray Snow*
_____
G. Murray Snow
United States District Judge